IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| COMPUTER SUPPORT, INC., | : | |
|     Plaintiff, | : | No. 1:08-cv-1672 |
| | : | |
| v. | : | (Chief Judge Kane) |
| | : | |
| ROCKING T, INC., | : | |
|     Defendant | : | |

**MEMORANDUM**

Pending before the Court is a motion for summary judgment filed by Defendant Rocking T, Inc. ("Rocking T"). (Doc. No. 21.) Rocking T seeks judgment in its favor as to all six counts in the complaint filed by Plaintiff Computer Support, Inc. ("CSI"). (See Doc. No. 1, Ex. A.) CSI has concurred in the dismissal of its claims based on promissory estoppel (Count II), unjust enrichment (Count III), and tortious interference (Count IV). (See Doc. No. 21 at 3.) Therefore, those claims will be dismissed at the outset. CSI's remaining claims include breach of contract (Count I), intentional misrepresentation (Count V), and negligent misrepresentation (Count VI). The motion has been fully briefed and is ripe for disposition. Based on the Court's following analysis, Rocking T's motion for summary judgment will be granted as to the misrepresentation claims but denied as to the breach of contract claim.

**I.    BACKGROUND**

Rocking T is a Texas trucking company operated by Richard Schilling. (Doc. No. 23 ¶ 1.) In addition to Rocking T, Schilling operates several small non-trucking companies. (Id. ¶ 4.) CSI is a Pennsylvania company which licenses software aimed at assisting transportation companies in their day-to-day operations. (Id. ¶ 2.) The software can accommodate multiple companies and consolidate financial statements from multiple companies into a single

1

consolidated financial statement. (Doc. No. 22 at 3.) Fred Nichols is the owner and president of CSI. (Doc. No. 25 at 4.)

A. **Initial Software Agreement**

In late 2001, Schilling became aware of CSI and its software through Denis Cowley, who used it at Booker Transportation Services, a separate Texas trucking company of which Schilling was part owner. (Doc. No. 23 ¶¶ 5-6.) The parties dispute whether there were any interactions between CSI and Rocking T prior to the execution of the parties' License and Support Agreement (the "Agreement"), but they agree that CSI prepared and sent the Agreement to Rocking T and that the parties entered into it in December 2001. (Doc. No. 23 ¶ 10.) Pursuant to the Agreement, Rocking T paid CSI $19,750 for a license to use its software. (Doc. No. 25 at 1.) Rocking T also paid an annual fee to CSI for "continuing information, research, design, and technical support and advice." (Doc. No. 23 ¶ 11; Doc. No. 24 ¶ 11.) This annual support period for technical support historically began in July. (Doc. No. 22 at 4.) The Agreement provides that the "[l]icensee shall not duplicate, distribute, demonstrate to any third party, nor lend the Licensed Program Materials without the prior, written consent of [CSI], which consent, in the case of affiliates of [l]icensee, shall not be unreasonably withheld." (Doc. No. 25 at 2.) The Agreement further stated that: "No action, regardless of form, arising out of this Agreement may be brought by either party more than two years after [the] cause of action has arisen." (Doc. No. 24 ¶ 13.)

After entering into the Agreement, Rocking T added at least thirteen other commonly-owned companies to the CSI software. (Doc. No. 23 ¶ 17; Doc. No. 24 ¶ 17.) Although the additional companies were added from 2003 to 2006, Nichols did not become aware of them

until March 2008. (Doc. No. 23 ¶ 17; Doc. No. 24 ¶ 17.) Rocking T states that it added the additional companies to the software pursuant to training provided by CSI employees on how to do so. (Doc. No. 23 ¶¶ 14-16.) However, CSI maintains that the training provided by its account managers was aimed at "setting up company divisions" and did not grant Rocking T "license to add thirteen additional companies to the [s]oftware without written authorization." (Doc. No. 24 ¶ 14.)

Nichols maintains that he was not aware of the addition of the companies to the software by Rocking T, but several other CSI employees appear to have had knowledge that the companies had been added. Mary Gould served as CSI's customer support representative. (Doc. No. 23 ¶ 21.) In that capacity, Gould has stated in an affidavit that she knew that Rocking added the additional companies to the software provided by CSI. (Id. ¶ 23.) Lisa Dingman, a part owner of CSI and its customer support manager, was responsible for managing Gould and "had responsibility for sales, collections, billings, preparing training manuals and negotiation contracts with clients." (Id. ¶ 24.) Nichols had delegated the responsibility of approving CSI's invoices to Dingman. (Id. ¶ 26.) Dingman was aware that Rocking T added additional "companies" to the software, but it is unclear to what extent she knew that they were separate companies and not merely subsidiaries or segmented divisions of Rocking T. (Doc. No. 24 ¶ 29.)

### B. Disputes Over Billing Cycle and Additional Companies

In January 2008, CSI sent Rocking T an invoice for license and continuing support services. (Id. ¶ 30.) Because the parties disputed whether the billing cycle began in February or in July, Rocking T contested the February renewal. (See Doc. No. 23 ¶ 31.) In March 2008,

3

Nichols became aware that Rocking T had shared the software with the other companies. (Doc. No. 24 ¶ 32.) As a result, CSI sent an invoice charging $197,500 to Rocking T demanding payment for additional licensing fees for those companies. (Id.) In response to the March 29, 2008 invoice, Raymond Brady, an individual who performed technology services for Rocking T and who was employed by one of the additional companies, sent an email on April 2, 2008, inquiring how the charges were calculated and indicating that there were "some test companies set up that we use for training purposes only." (Doc. No. 23 ¶ 34.)

In June 2008, the parties' disputes over the start of the billing cycle and fees for the additional companies remained unresolved. On June 30, 2008, Schilling contacted Nichols via email for the stated purpose of "resolv[ing] all issues" between the parties. (See Doc. No. 24, Ex. O at 7.) Nichols and Schilling then exchanged a number of emails from July 1 to July 8, 2008. In his first email response, Nichols asked Schilling to what issues he was referring. Nichols indicated that CSI "had extended terms almost 3 months and still ha[d] not received payment." (Id. at 6.) Additionally, Nichols stated that "[t]he number of users and companies need to get into contractual compliance and any past due fees addressed." (Id.)

In his second email, Schilling outlined that the two disputed issues were (1) the renewal dates for the annual support and (2) the billing sent for the additional companies. (Id. at 5-6.) Schilling stated that "Rocking T is the only company using [CSI's] trucking package. Other companies were set up with both your knowledge and assistance. Exceeding the allowable concurrent users has never been a problem." (Id. at 6.) Schilling further wrote:

> I am willing to pay $7,000 to continue the service for Rocking T and settle all issues. In the spirit of settling, the other companies can easily be taken off CSI. Not saying I am in the wrong, I am trying to meet you half way [sic]. In this same spirit, you need to look at the

4

erratic "annual billing" that was presented to us.

(Id.)  In response, Nichols sent Schilling an email which began:  "Let's settle this."  (Id. at 4.) Nichols wrote that the renewal dates for the Agreement should be from February 1, 2008, through January 31, 2009, and that the "current invoice should be for 2/1/07 through 1/31/08 . . . for $7,100."[1]  (Id. at 5.)  Nichols further indicated that "[b]illing sent for additional companies will be credited," and that "[o]ne company, Rocking T[,] would be established on [the software] and have 10 concurrent users."  (Id.)  Nichols also stated that "[o]n receipt of payment and obtaining access to your server we will revise trigger date to support periods."  (Id.)

In his third email, Schilling asked whether the current invoice for $7,100 would be paying for February 1, 2008 through January 31, 2009.  (Id. at 4.)  Nichols responded that it would.[2]  (Id.)  Next, Schilling asked whether Nichols was "referring to the invoice" sent on March 29, 2008 for $197,500.  (Id.)  Nichols responded in the affirmative.  (Id.)  Third, Schilling asked how much time Rocking T would have to remove the other companies in light of the impending July 4 holiday.  (Id.)  Nichols' response was July 31, 2008.  (Id.)  Schilling additionally indicated that he did not "want any more surprises" and asked whether "this [would] clear everything up?"  (Id.)  Nichols again responded in the affirmative.  (Id.)

---

[1] It appears that this was a typographical error by Nichols.  He originally stated that the renewal dates should be from February 1, 2008, through January 31, 2009.  (Doc. No. 24, Ex. O at 5.)  He then indicated that "[t]he invoice for the revised period 2/1/07 through 1/31/08 for $7,100 was paid on 3/8/07," but then stated that "[t]he current invoice should be for 2/1/07 through 1/31/08 and for $7,100."  (Id.)  Schilling subsequently asked whether the current invoice would be paying for February 1, 2008 through January 31, 2009, and Nichols responded that it would.  (Id. at 4.)  To the extent that any contradiction remains, it is properly resolved by the fact finder.

[2] Nichols wrote his answers in the body of Schilling's earlier email.

5

On July 2, 2008, Rocking T issued a check for $7,100 to CSI. (Doc. No. 23 ¶ 47.) That same day, at 3:45 p.m., Schilling sent Nichols a fourth email: "Another question came up as to the additional companies. Can we simply stop using? The only time it would be used is to look at history if the need ever arises. Would be a lot easier and quicker for us." (Doc. No. 24, Ex. O at 3.) Nichols asked for clarification: "If these are test companies, why do you need access to history?" (Id.) Schilling sent Nichols a fifth email, asking what Nichols meant by "test companies." (Id.) In his response sent at 2:30 p.m. on July 7, 2008, Nichols stated:

> If we are granted access to the server we will reset the trigger for Rocking T data. Raymond Brady has indicated to us the other companies were for "test" companies. Based on your input, this does not appear to be the case. The data associated with these companies will be deactivated. Section 4.4 of contract addresses terms for additional companies. The invoice for their respective license fees will not be credited. If you can shed any additional light on these companies, it would be appreciated.

(Id. at 2-3.) Schilling responded with his sixth email at 4:48 p.m. on July 7, 2008:

> Are you saying the $7,100 check does not settle all issues as we had agreed? If so, do not deposit the check and we will each draw our line in the sand. I have just now read the e-mail Raymond [Brady] sent you 4-2-08 and he said "We have made several changes to our database server over the last year and we also have some test companies setup [sic] that we use for training purposes only[.]" This is all true. I entered into the agreement with you under the assumption that all of these points of disagreement were to be settled and Rocking T would renew its license for another year. Let me know your intentions.

(Id. at 2.) Nichols responded at 6:07 a.m. on July 8, 2008, by sending a list of additional companies that Rocking T had set up in the CSI software. Nichols stated: "Since you have processed data and want to continue to have access to that data it would appear that they are not 'test' companies as previously indicated. Each company has a valid federal tax id [sic]. Please

6

explain?" (Id. at 1.)

Schilling responded that same day at 10:05 a.m.: "As I stated yesterday, if you aren't going to honor the settlement, do not deposit the check." (Id.) Nichols' final email response stated:

> 1. The check was received and deposited yesterday. Consequently we were given access to your server and activated Rocking T.
>
> 2. The companies you had setup [sic] within [the CSI software] do not appear to be test companies, as was represented to us previously.
>
> The invoice for respective license fee is past due.

(Id.)

On August 11, 2008, CSI filed a complaint in the Cumberland County Court of Common Pleas, Pennsylvania, based on Rocking T's non-payment for the additional companies which had utilized the CSI software. On September 9, 2008, Defendant removed the matter to this Court based on diversity of citizenship. (Doc. No. 1); see also 28 U.S.C. §§ 1332, 1441.

## II. STANDARD OF REVIEW

Rocking T has moved for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, which provides that "[t]he judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine only if there is a sufficient

evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. Id. at 248-49.

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004). Once the moving party has shown that there is an absence of evidence to support the non-moving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group, Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006) (citations omitted); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322-23. In considering a motion for summary judgment, the Court must "consider all evidence in the light most favorable to the party opposing the motion." A.W. v. Jersey City Pub. Sch., 486 F.3d 791, 794 (3d Cir. 2007) (citation omitted).

## III. DISCUSSION[3]

In its motion for summary judgment, Rocking T avers that CSI's remaining claims for breach of contract, intentional misrepresentation, and negligent misrepresentation should be dismissed for three reasons. First, Rocking T asserts that CSI's claims are barred by a settlement

---

[3] The Court notes that the Agreement at issue includes a choice of law provision stating that Pennsylvania state law shall govern. (See Doc. No. 24, Ex. A at 17.) Additionally, neither party disputes that Pennsylvania law should govern in this case, as both sides' briefs cite almost exclusively to Pennsylvania cases.

agreement previously entered into by the parties to resolve the disputed license fees and the annual technical support billing cycle. (Doc. No. 22 at 12.) Second, Rocking T argues that CSI's claims are time-barred. (Id. at 15.) Finally, Rocking T argues that CSI has failed to state a claim for negligent or intentional misrepresentation. (Id. at 20.) The Court will address each defense in turn.

### A. E-Mail Agreement

Rocking T first claims that the parties entered into a settlement agreement in order to resolve the disputed license fees and the billing cycle for annual technical support. (Doc. No. 22 at 12.) As the source of such an agreement, Rocking T points to the email exchange that transpired between Schilling and Nichols in July 2008, and asserts that:

> To settle all issues, Mr. Schilling proposed to pay $7,000 to continue the support for another year. Otherwise, Rocking T was not going to renew the annual support. Mr. Nichols responded, "Let's settle this..." and proposed an annual support period from February through January, a credit for the $197,500.00 for Additional Companies and payment of $7,100.00 to renew annual support for another year with Rocking T being the only company using the Software. Mr. Nichols confirmed, unequivocally, that the parties' resolution would "clear everything up." Rocking T agreed to these terms by sending the agreed upon payment of $7,100 to [CSI]. [CSI] accepted the payment and deposited the check. [CSI] settled all issues and is now bound by its settlement agreement.

(Doc. No. 22 at 14.) Although Rocking T characterizes the agreement between Rocking T and CSI as a "settlement agreement," CSI points out that it is more akin to an accord and satisfaction. (Doc. No. 25 at 12.) The Court agrees, as no legal action had yet been mentioned by either party. See Mastroni-Mucker v. Allstate Ins. Co., 976 A.2d 510, 518 (Pa. Super. Ct. 2009) (listing the elements of a valid settlement agreement as "'an offer (the settlement figure), acceptance, and consideration (in exchange for the plaintiff terminating his lawsuit, the

9

defendant will pay the plaintiff the agreed upon sum)'" (quoting Muhammad v. Strassburger, McKenna, Messer, Shilobod and Gutnick, 587 A.2d 1346, 1349 (Pa. 1991)).

"An accord is a contract under which an obligee promises to accept a stated performance in satisfaction of the obligor's existing duty. Performance of the accord discharges the original duty." Restatement (Second) of Contracts § 281(1) (1981). "The elements of accord and satisfaction are: (1) a disputed debt (2) a clear and unequivocal offer of payment in full satisfaction and (3) acceptance and retention of payment by the offeree." PNC Bank, Nat'l Ass'n v. Balsamo, 634 A.2d 645, 655 (Pa. Super. Ct. 1993) (citing Law v. Mackie, 95 A.2d 656 (Pa. 1953)). "[P]artial payment of a liquidated debt[4] does not constitute an accord and satisfaction because in such a situation the creditor has given no consideration." Id. (citing Nies v. Metro. Cas. Ins. Co. of N.Y., 177 A. 754 (Pa. 1935)). As such, "[a]n element essential to the defense of accord and satisfaction is an actual and substantial difference of opinion as to the amount due." Id. (citing Hayden v. Coddington, 82 A.2d 285, 287 (Pa. Super. Ct. 1951)).

In arguing that no accord was consummated between the parties, CSI points to the $7,100 that Rocking T paid to it as "the undisputed (and overdue) amount owed for license and continuing support services." (Doc. No. 25 at 12.) CSI argues that because such money was already owed, any agreement between the parties was not supported by adequate consideration. (Id.) Specifically, CSI argues that:

> Because the sum conceded to be due and owing was paid by Rocking T and accepted by CSI, that payment furnished no additional consideration towards the satisfaction of the separate invoice seeking licensing fees for the additional companies that had been added to the

---

[4] A "liquidated debt" is "[a] debt whose amount has been determined by agreement of the parties or by operation of law." Black's Law Dictionary 463 (9th ed. 2009).

10

> Software. As such, CSI was more than entitled to cash the $7,100 check and institute the instant action to recover the additional licensing fees. No additional consideration was exchanged; there was never any legitimate dispute as to when or whether Rocking T owed CSI $7,100 for the annual license and continuing support services fee.

(Id. at 13.) CSI further argues that, even if an agreement was reached, it was clearly rescinded by CSI when Nichols learned that the additional companies were not merely test companies. (Id.)

Rocking T raises two arguments in response to CSI's contention that there was no consideration to make a legally binding contract. First, Rocking T argues that CSI is bound by the agreement "regardless of whether consideration existed, because its corporate designee admits it intended to be legally bound." (Doc. No. 26 at 3.) Rocking T points to 33 P.S. § 6, which states: "A written release or promise, hereafter made and signed by the person releasing or promising, shall not be invalid or unenforceable for lack of consideration, if the writing also contains an additional express statement, in any form of language, that the signer intends to be legally bound." (Doc. No. 26 at 3.) Citing the email exchange between Nichols and Schilling, Rocking T argues that Nichols agreed to settle the parties' disputes. (Id.) Specifically, Rocking T cites to Nichols' affirmative response that the parties' agreement would "clear everything up," and couples it with Nichols' deposition testimony that he intended for his statement to be legally binding. (Id. at 3-4.)

The Court finds this first argument unconvincing. The Pennsylvania statute cited by Rocking T states that consideration is not required where the agreement "contains an . . . express statement . . . that the signer intends to be legally bound." See 33 P.S. § 6. Although Nichols wrote that he intended for the payment of $7,100 to "clear everything up," the email exchange

11

include no express language that it was Nichols' intent to be legally bound. His deposition testimony indicated that such an intent may have been present, but the express, signed "written release or promise" required by the statute is completely absent.

Rocking T next argues that valid consideration does, in fact, exist to support the accord. Specifically, Rocking T contends that "[c]onsideration . . . exists because a reasonable dispute existed about the billing cycle for annual support and Rocking T only renewed its annual support for an additional year, which it was not obligated to do, because the parties resolved all issues." (Doc. No. 26 at 5.) However, according to CSI, "there was never any legitimate dispute as to when or whether Rocking T owed CSI $7,100 for the annual license and continuing support services fee." (Doc. No. 25 at 13.)

Simply put, a genuine issue of material fact remains as to whether there was a legitimate dispute between the parties as to the amount paid. Therefore, Rocking T's motion for summary judgment will not be granted on this basis.

### B.     Statute of Limitations

Rocking T next claims that CSI's claims are barred by the two year statute of limitations included in the parties' Agreement. (Doc. No. 22 at 15.) As Rocking T correctly points out, Pennsylvania law permits parties to enter into contracts that limit the time to bring suit. See Gen. State Auth. v. Planet Ins. Co., 346 A.2d 265, 267 (Pa. 1975). In this case, the Agreement between CSI and Rocking T includes the following provision: "No action, regardless of form, arising out of this Agreement may be brought by either party more than two years after [the] cause of action has arisen, or, in the area of non-payment, more than two years from the date of the last payment." (Doc. No. 24, Ex. A at 18.) Rocking T claims that CSI's cause of action

arose when additional companies were added to the software, which occurred prior to August 2006. See Packer Soc'y Hill Travel Agency, Inc. v. Presbyterian Univ. of Pa. Med. Ctr., 635 A.2d 649, 652 (Pa. Super. Ct. 1993) ("In general, an action based on contract accrues at the time of breach."). CSI did not file its complaint until August 11, 2008. Therefore, Rocking T suggests that CSI's claims should be time-barred under the terms of the Agreement.

In response, CSI argues that the discovery rule applies, thereby tolling the statute of limitations. "The discovery rule is a 'judicially created device which tolls the running of the applicable statute of limitations until the point where the complaining party knows or reasonably should know that he has been injured and that his injury has been caused by another party's conduct.'" Coleman v. Wyeth Pharms., Inc., 6 A.3d 502, 510 (Pa. Super. Ct. 2010) (quoting Crouse v. Cyclops Indus., 745 A.2d 606, 611 (Pa. 2000)). In providing guidance as to whether a plaintiff exercised reasonable diligence, Pennsylvania state courts have emphasized the role of the jury in making such a determination:

> Recognizing that a plaintiff's awareness of an injury and its cause is fact-intensive, our courts have held that ordinarily this is an issue "best determined by the collective judgment, wisdom and experience of jurors." It is the factfinder who must focus on whether the plaintiff was reasonably diligent in discovering his injury and that it was caused by a third party. Even though this is an objective standard, it is to be applied with reference to individual characteristics. Our courts maintain that the standard "is sufficiently flexible . . . to take into account the differences between persons and their capacity to meet certain situations and the circumstances confronting them at the time." Where there are factual and credibility determinations to be made regarding the reasonable diligence of the plaintiff, that issue should be submitted to the finder of fact.

Coleman, 6 A.3d at 510 (internal citations omitted). Thus, "[i]t is only when 'reasonable minds would not differ in finding that a party knew or should have known on the exercise of reasonable

13

diligence of his injury and its cause' that a court may determine that the discovery rule does not apply as a matter of law." Id. at 511 (citation omitted).

In the present case, CSI avers that the two year limitations period did not begin to run until Nichols, "the only individual from CSI with authority to negotiate and execute agreements[,] became aware that Rocking T had added multiple companies to the Software." (Doc. No. 25 at 14.) According to CSI, notice to any CSI employee (other than Nichols) that additional companies were being added to the software was not adequate to impute notice to CSI because knowledge of such a fact was not material to her duties to CSI. (See id. at 14 (citing Restatement (Third) of Agency § 5:03).) CSI additionally argues that, even if notice could be imputed to its principal through its account managers, the "company" or "comp/div" fields used in the software program "did not necessarily signify the existence of an actual, additional company." (Id. at 15.) "Thus, if a new 'company' or 'comp/div' was set up in the Software, it could be any number of things, including an affiliate, a subsidiary, or a segmented division of a company – all of which are perfectly acceptable and would not signify any wrongdoing to CSI's account managers." (Id. at 16.)

In opposition, Rocking T argues that CSI cannot establish that it could not have known of Rocking T's alleged misuse of the software through the exercise of reasonable diligence. (Doc. No. 22 at 17.) Additionally, Rocking T argues that, even if the discovery rule applies, CSI received imputed knowledge through its employees Gould or Dingman. (Id. at 18-20.)

Given the fact finding and credibility determinations that will be necessary to make a call over the reasonable diligence exercised by Nichols and CSI, the Court is unable at the summary judgment stage to determine whether the discovery rule applies as a matter of law. Rocking T

14

has put forward evidence that Gould and Dingman knew that there were additional companies besides Rocking T using the CSI software. "Where an agent receives notice, that notice is imputed to the principal." In re Color Tile, Inc., 475 F.3d 508, 513 (3d Cir. 2007). However, knowledge of an agent may only be imputed to the principal where the agent was acting within the scope of her authority. Workmen's Comp. Appeal Bd. v. Evening Bulletin, 445 A.2d 1190, 1192 (Pa. 1982). If the scope of an agent's authority is not set forth in a written instrument and is a disputed issue of fact, the extent of the authority is generally an issue of fact to be determined by the jury. See Waldron v. Aetna Cas. & Surety Co., 141 F.2d 230, 234 (3d Cir. 1944). CSI has pointed to genuine issues of material fact concerning the extent of Dingman's knowledge as well as the scope of authority given to Gould and Dingman. Given the outstanding issues of material fact over whether the discovery rule is implicated, the Court must deny Rocking T's motion for summary judgment.

### C. Failure to State Misrepresentation Claims

Finally, Rocking T argues that CSI's misrepresentation claims fail because CSI has failed to produce evidence of a prima facie case. (Doc. No. 22 at 20.) To establish a cause of action for intentional misrepresentation, the plaintiff must allege the following elements:

> (1) [a] representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and, (6) the resulting injury was proximately caused by the reliance.

Bortz v. Noon, 729 A.2d 555, 560 (1999) (citation omitted). Negligent misrepresentation differs in that a plaintiff does not need to prove that the speaker knew the statement to be false, only that she should have known its falsity. Id. at 561.

15

The evidence that CSI points to as the misrepresentation by Rocking T is the April 2, 2008 email sent by Bradley to CSI that there were "some test companies set up that [Rocking T] use[s] for testing purposes only." (Doc. No. 23 ¶ 34; see Doc. No. 1, Ex. A ¶¶ 56, 64.) Rocking T argues that Bradley's statement was not false, and that, even if it were, CSI has failed to produce any evidence of injury that occurred from the misrepresentation. Indeed, the alleged misrepresentation occurred in April 2008, after CSI sent its March 2008 invoice for the additional companies. Therefore, according to Rocking T, CSI can prove no damages resulting from any misrepresentation by Bradley. (Doc. No. 22 at 22.)

In response, CSI argues that "[w]ithout such misrepresentations, CSI would not have been forced to expend the funds and resources necessary to pursue the instant litigation to recover its license fees." (Doc. No. 25 at 18.) CSI's contention is that Bradley's alleged misrepresentation, furthered by Schilling, has put CSI in the position of having to litigate their rights against Rocking T for its misuse of the software.

The Court finds CSI's argument unpersuasive. The statements made by Bradley and Schilling were made after the Agreement was entered into by the parties – and after CSI suspected that the other companies had been added to the software. Any injury that occurred in this case was the result of Rocking T's alleged breach of the Agreement by adding additional companies to the CSI software. The necessity of resorting to litigation is not an injury in and of itself. See Sprint Commc'ns Co., L.P. v. APCC Servs., Inc., 128 S. Ct. 2531, 2535 (2008) (noting that litigation will "redress" a party's "injury in fact"). Therefore, CSI has failed to provide sufficient evidence for either an intentional or negligent misrepresentation claim. Rocking T's motion for summary judgment will be granted as to these claims.

## IV. CONCLUSION

For the foregoing reasons, the Court will deny Rocking T's motion for summary judgment as to CSI's breach of contract claim. The Court will grant Rocking T's motion for summary judgment as to all other claims. An order consistent with this memorandum follows.

**IN THE UNITED STATES DISTRICT COURT**

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| COMPUTER SUPPORT, INC., : | |
|     Plaintiff, : | No. 1:08-cv-1672 |
| : | |
| v. : | (Chief Judge Kane) |
| : | |
| ROCKING T, INC., : | |
|     Defendant : | |

## ORDER

**AND NOW**, on this 24th day of January 2011, for the reasons articulated in the accompanying memorandum, it is **HEREBY ORDERED THAT** Defendant's motion for summary judgment (Doc. No. 21) is **GRANTED IN PART** as follows:

1. The motion for summary judgment is granted as to Count II (promissory estoppel), Count III (unjust enrichment), Count IV (tortious enrichment), Count V (intentional misrepresentation), and Count VI (negligent misrepresentation). Accordingly, those claims are **DISMISSED**.

2. The motion for summary judgment is **DENIED** as to Count I (breach of contract).

3. The Clerk of Court shall defer entering judgment until all claims have been adjudicated.

4. The Court-ordered stay (Doc. No. 29) is hereby lifted. A telephone conference will be held on February 28, 2011, at 11:00 a.m. Plaintiff's counsel shall initiate the call. The phone number of the Court is 717-221-3990.

                                                  S/ Yvette Kane
                                                  Yvette Kane, Chief Judge
                                                  United States District Court
                                                  Middle District of Pennsylvania